## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )          Criminal No.:1:19CR00023-001 (CFC)
                                         )
KRISTIAN JAMES O'HARA,                   )          **UNDER SEAL**
                                         )
                    Defendant.           )


## MOTION FOR VARIANCE AND SENTENCING MEMORANDUM

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ....................................................................................................................... 1

KRISTIAN O'HARA'S PERSONAL BACKGROUND ............................................................ 3

   I.   Kristian's Youth ............................................................................................................... 3

     A.  High School ............................................................................................................... 3

       █████████ ............................................................................................................... 4

   II.  Kristian's Employment History ...................................................................................... 5

   III.  Charitable Endeavors ...................................................................................................... 6

   IV.  A Prolonged Period of Self-Reflection .......................................................................... 6

     A.  Therapy ..................................................................................................................... 7

     B.  Parents ...................................................................................................................... 9

     C.  Faith ......................................................................................................................... 9

     D.  Friendship ................................................................................................................. 9

   V.  Law Enforcement Letters of Support ........................................................................... 10

   VI.  Acceptance of Responsibility ....................................................................................... 11

   VII.  Moving Forward .......................................................................................................... 12

LEGAL ARGUMENT .............................................................................................................. 13

   I.   Sentencing Under Booker and Pursuant to 18 U.S.C. § 3553 ...................................... 13

     A.  The United States Court of Appeals for the Third Circuit ....................................... 15

     B.  The United States District Court, District of Delaware ........................................... 15

   II.  The Sentencing Guidelines ........................................................................................... 16

     A.  Guidelines Calculation ........................................................................................... 16

     B.  The PSR is Incorrect with Regard to Application of Grouping Principles .............. 16

       1.  The PSR ............................................................................................................. 16

2.   The Appropriate Analysis...............................................................16

3.   Victims 2 and 3.............................................................................18

4.   The United States District Court, District of Delaware ..............18

III.   A Substantial Variance is Appropriate to Avoid Unwarranted Sentencing Disparities ....19

A.   A Variance to a Non-Custodial Sentence is Permissible .................................19

B.   A Substantial Variance is Necessary to Avoid Unwarranted Sentencing Disparities ....20

1.   United States District Court, District of Delaware ...................................21

a.   United States v. Upadhyay .............................................................21

b.   United States v. Castro ...................................................................22

c.   Other District of Delaware Cases Are Dissimilar...........................23

i.   United States v. Matusiewicz, et al. ......................................24

ii.   United States v. Generette .....................................................24

iii.   United States v. Yung...........................................................25

2.   Co-conspirator 1 ...........................................................................26

3.   Other Similar Federal Cases .........................................................28

IV.   A Substantial Variance is Appropriate because Kristian has Demonstrated a Commitment and Ability to Refrain from ever again Engaging in such Conduct .........................................29

VI.   Kristian Has Been Punished ......................................................................32

IX.   General Deterrence .....................................................................................34

CONCLUSION........................................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*Kimbrough v. United States*, 522 U.S. 85 (2007) ........................................................................14

*Rita v. United States*, 551 U.S. 338  (2007)...............................................................................13

*United States v. Ali*, 508 F.3d 136 (3d Cir. 2007) .....................................................................15

*United States v. Begin*, 696 F.3d 405 (3d Cir. 2012)..................................................................20

*United States v. Booker*, 543 U.S. 220 (2005)............................................................................12

*United States v. Castro*, Crim. No. 14-47-LPS (D. Del. 2014) .................................................21

*United States v. Chase*, 340 F.3d 978 (9th Cir. 2003) .............................................................31

*United States v. Cooper*, 437 F.3d 324 (3d Cir. 2006) ..............................................................19

*United States v. Gall*, 522 U.S. 38 (2007) ...........................................................................14, 19

*United States v. Generette*, Crim. No. 13-50 (SLR) (D. Del. 2013).........................................23

*United States v. Gunter*, 462 F.3d 237 (3d Cir. 2006).........................................14, 15, 20, 25

*United States v. Hersh*, 297 F.3d 1233 (11th Cir. 2002) .........................................................16

*United States v. K*, 160 F.Supp.2d 421 (E.D.N.Y. 2001) .........................................................19

*United States v. Matusiewicz*, Crim. No. 13-83 (D. Del. 2013) ................................................23

*United States v. Nagel*, 2011 WL 4025715 (E.D.N.Y. 2011)....................................................27

*United States v. Upadhyay*, Crim. No. 08-118-JJF (D. Del. 2008) ..........................................20

*United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006) .........................................................19

*United States v. Yung*, Crim. No. 17-14-LPS (D. Del. 2017).....................................................24

**Statutes**

18 U.S.C. § 2261A(2) ............................................................................................................16, 27

18 U.S.C. § 2261A(2)(B) ..............................................................................................................16

18 U.S.C. § 3553(a) ................................................................................................................passim

18 U.S.C. § 3553(a)(2)(C) .............................................................................................................28

18 U.S.C. § 3553(a)(6) ...........................................................................................................passim

18 U.S.C. § 8553(a)(2)(D) .............................................................................................................30

**Other Authorities**

*ACLU, Medical and Mental Health Care*, https://www.aclu.org/issues/prisoners-rights/medical-and-mental-health-care (last visited July 23, 2019)................................................................30

*National Institute of Justice, Office of Justice Programs,* "Five Things About Deterrence." https://nij.gov/five-things/pages/deterrence.aspx (last visited July 24, 2019)..........................33

U.S.S.G. § 1B1.2(d)................................................................................................................16

U.S.S.G. § 3D1.2 ....................................................................................................................17

U.S.S.G. § 3D1.4 ................................................................................................................16, 17

## INTRODUCTION

In fashioning an appropriate sentence, the Court must impose punishment that is sufficient, but not greater than necessary, to address the conduct at issue.  Kristian O'Hara respectfully requests that the Court grant his motion for a variance and impose a sentence of: (1) time served; (2) probation with mandatory mental health counseling, alcohol treatment, significant community service and installation of monitoring software on all electronic devices; and (3) restitution in the full amount requested by Victim 1 and her family.  Kristian will bring a check in the amount of $14,780, the full amount of restitution requested, to his sentencing hearing.

Such a sentence (1) ensures that Kristian is sufficiently punished for his criminal conduct; (2) provides more than sufficient deterrence to Kristian and others; (3) protects the public from any risk of recidivism by Kristian; (4) ███████████████████████████ ████████ ███████████████████████████████████████ ███ and (5) ensures that Victim 1 and her family receive full restitution.

Kristian has demonstrated that he does not pose a danger to anyone in the future.  He has fully complied with the significant restrictions placed on him, pursuant to his terms of release, demonstrating that he is fully capable of controlling himself, and has a keen understanding of the seriousness of the conduct in which he engaged.  (*See* PSR ¶ 15-17).[1]  To help Kristian explore why he engaged in this troubling and criminal conduct, as well as to develop mechanisms to deal with his emotions in the future to ensure that he never again engages in such conduct, ████████ ███████████████████████████████████████████████████████████ ███ Kristian has also sought spiritual guidance ████████████████ ███████████████████████████████████████████████████████████

---

[1] The parties have not received the Final PSR.  Accordingly, citations to certain paragraphs in the PSR may change.

1

█████████████████████████████████████████

██ Finally, Kristian has the tremendous support of his nuclear family, who have stood by him since his arrest, and have themselves greatly altered their lives to accommodate the restrictions placed on Kristian and them to ensure Kristian's continued release from custody.   (*See* PSR ¶ 15, Ex. G, H, I).   Their love and support will certainly ensure that Kristian never engages in this conduct again.

A non-custodial sentence will also ensure that there is not an unwarranted sentencing disparity between Kristian and others in the District of Delaware and elsewhere who have similar criminal histories and who have engaged in similar criminal conduct.   In the District of Delaware, where defendants with no criminal records have engaged in stalking/harassing conduct that is equally, if not more, serious than Kristian's conduct, the Federal District Court for the District of Delaware has issued non-custodial sentences.

Moreover, if Kristian is sentenced to a term of additional incarceration, it will result in an egregious disparity in outcome between Kristian and his co-conspirator, hereinafter referred to as Co-Conspirator 1. ██████████████████████████, Co-Conspirator 1 undisputedly was involved in almost every aspect of the offense conduct and relevant conduct, including many times as the primary actor.   Yet, Co-Conspirator 1 has not been prosecuted by the Government, despite that he is not a Government cooperator against Kristian.   While it is the Government's prerogative to prosecute as it sees fit, pursuant to 18 U.S.C. § 3553(a)(6), there would be an extreme and unwarranted disparity in punishment between Kristian and Co-Conspirator 1 if Kristian is sentenced to a period of additional incarceration, while his co-conspirator is not even prosecuted, and thus, does not have a felony conviction on his record, does not serve a single day in prison, does not have any restrictions placed on his liberty and does not have to pay restitution.

Accordingly, we respectfully request that the Court grant Kristian's motion for a substantial variance pursuant to § 3553(a) and the case law.

## KRISTIAN O'HARA'S PERSONAL BACKGROUND

I.   **Kristian's Youth**



Kristian, his parents and his brother have always had a very close knit and supportive relationship.  (*See* Ex. G, H, I).

*A.  High School*



Rather, this volunteer work was due to Kristian's devotion to his Catholic faith and his desire to help others.



## II.   Kristian's Employment History





### III.    Charitable Endeavors

Despite his significant flaws and busy school and work schedules, since graduating high school Kristian still involved himself with many charitable endeavors. (*See* Ex. C, G, H).  Kristian



Unfortunately, since his arrest, the restrictions on Kristian have made continued employment and charitable endeavors virtually impossible.

### IV.    A Prolonged Period of Self-Reflection

After being arrested, Kristian spent 28 days incarcerated in two different federal facilities before he was released by the Honorable Christopher J. Burke, United States Magistrate Judge. (*See* PSR ¶ 2-3).  When Kristian was finally released, tremendous restraints were put on his freedom, including: (1) the inability to utilize **any** telephone; (2) the inability to utilize **any** computer or other similar electronic device, such as an iPad; (3) the inability to utilize the internet; (4) the inability to leave the confines of his home (including to even sit on the deck of his house to get fresh air) except for medical appointments ▮▮▮▮▮▮▮▮▮▮▮▮ legal appointments with his attorneys, employment (which he could never obtain) and religious purposes; and (5) the inability to drink any alcohol.[2] (*See* PSR ¶ 15-17, 216).

---

[2] Ultimately, on or about April 17, 2019, after Kristian entered his guilty plea, his restrictions were moderated, such that he is now able to utilize the telephone to speak with his attorneys, probation

In addition, restrictions were also placed on his family. (*See* PSR ¶ 15). Kristian's parents have acted in full conformity with all requirements as third party custodians, including the removal of all cellular telephones, iPads and computers from the home each time they leave the home, including the cellular telephone belonging to Kristian's brother ████ (*See* PSR ¶ 17). They have regularly communicated with probation because Kristian initially was not permitted to utilize the telephone, at all, and only recently has been granted permission to utilize the telephone to speak with probation if one of his parents is home. (*See* PSR ¶ 15-17).

Despite these incredibly tight restrictions, and the Government's professed belief that Kristian would not be able to control himself to adhere to such restrictions, Kristian has fully complied. While the Government averred at the time of his bail hearing that Kristian was a danger to the community and that there were no set of conditions that would ensure the safety of the community if Kristian were released, that has proven to be anything but true. Kristian has demonstrated that he is more than capable of complying with even the most stringent of bail conditions -- conditions that many of us would find daunting. (*See* PSR ¶ 15-17). This is because Kristian has taken the last year to reflect on his abhorrent behavior, reconnect with his immediate family, his closest friends and faith, and, most importantly, reconnect with who he really is as a person.



and ████ so long as one of his parents is in the home, and he is allowed to sit on the back deck of his home to get fresh air. (*See* PSR ¶ 16).



### B. Parents

Kristian has also had a tremendous amount of time to speak with his parents about his criminal conduct, emotional struggles and hopes for the future. (*See* Ex. G, H). Almost every evening since his release in August 2018, Kristian has had family dinner with his parents -- allowing him to have open communication with his parents. (*See* Ex. G, H). His parents have provided guidance to Kristian, as well as a tremendous amount of love and support. (*See* Ex. G, H). As Kristian has indicated, family is the most important thing to him. (*See* PSR, Offender Characteristics). This open dialogue with his parents has allowed him to further reflect on and learn from his bad behavior. (*See* Ex. G, H).

### C. Faith

Kristian has also turned to his Catholic faith during this time. His faith has forced him to address his demons, as well as helped him get through this emotionally trying time in his life. (*See* Ex. B, G). He has sought the counsel of ███████ who has helped Kristian reconnect with his faith, and, in the words of Kristian's father, ████████████████ (*See* Ex. B, G).

### D. Friendship

It is not surprising that after his arrest, Kristian learned very quickly who his true friends were. His true friends were not Co-conspirator 1 nor the troubled young men who participated in the Beast Mode chat, but rather are those who know the real, kind, caring and compassionate Kristian. Those who have stuck by him, despite his bad acts.





## V.   Law Enforcement Letters of Support

However, it is not just friends from high school and college, and family members, who have written letters of support for Kristian. Current and former members of law enforcement, who know Kristian and his family, have come out in support of Kristian, after taking the time to understand the charges and speak with Kristian about his criminal conduct.





## VI.    Acceptance of Responsibility

Kristian has truly accepted responsibility for his conduct. Immediately after being arrested,

he indicated to the U.S. Attorney's Office, through his counsel, that he wished to plead guilty,

11

Moreover, he has repeatedly professed his acceptance of responsibility.  He provided the following written statement to probation, which is incorporated into his PSR:

> I take full responsibility for my actions.  I am truly remorseful and deeply regret my conduct.  As I reflect on my behavior, I am ashamed and embarrassed.  I acted with great immaturity and no empathy toward others, especially Victim 1 and her parents.  I would like to tell Victim 1 and her parents, as well as all of the other victims, that I am sorry.  After meeting weekly with a therapist, I have learned many different methods to deal with negative emotions and situations that will inevitably arise in the future.  I will use these tools to make sure I never behave like this again.  My actions have also put my family in a negative situation, both emotionally and financially.   While their love and support for me has been unwavering, I would like to tell them that I am truly sorry.  I know I have learned from this experience, and I hope to redeem myself as soon as possible.

## VII.   Moving Forward

Kristian is only 24 years old.  While Kristian would love to pursue a career in finance, he understands that his conviction will most likely make that impossible.  Accordingly, Kristian has spent a great deal of time re-evaluating what is important to him and what he would like to do with his life.

Kristian has determined that he would like to combine his passion for sports with his passion for helping young people address their emotions.  He would like to coach young people in sports, which would give him the opportunity to help young people, both on and off the field.  (*See* Ex. G).  In particular, Kristian would like help others avoid making tragic decisions similar to those he made, and act as a positive influence in their lives.   Kristian, unfortunately, understands all too well how ones emotional well-being can affect the decisions made in life, especially in the era of social media.  (*See* Ex. A).

12

## LEGAL ARGUMENT

I.   **Sentencing Under Booker and Pursuant to 18 U.S.C. § 3553**

In *Booker*, the Supreme Court held that the mandatory United States Sentencing Guidelines violated the Sixth Amendment's jury-trial guaranty. *United States v. Booker*, 543 U.S. 220, 244 (2005). As modified, the Court in *Booker* held the Sentencing Guidelines are "effectively advisory." *Id.* at 245. Thus, in *United States v. Kimbrough*, 552 U.S. 85 (2007), the Supreme Court made clear that the Guidelines were now only "one factor among several courts must consider in determining an appropriate sentence." *Id.* at 90.

Accordingly, while a sentencing court should "consider Guideline ranges . . . it permits the court to tailor the sentence in light of other statutory concerns" including 18 U.S.C. § 3553(a). *Id.* Thus, "[s]ection 3553(a) remains in effect, and sets forth numerous factors that guide sentencing." *Booker*, 543 U.S. at 261.

The primary directive of Section 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with" the purposes set forth in Section 3553(a)(2), which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553 further directs sentencing courts to consider the following factors:

1)   The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1));

2)    The kinds of sentences available (§ 3553 (a)(3)); and the kinds of
      sentences and the sentencing range established by the Guidelines for the
      applicable category of offense committed by the applicable category of
      defendant (§ 3553 (a)(4)); and any pertinent policy statement issued by
      the Sentencing Commission (§ 3553 (a)(5));

3)    The need to avoid unwarranted sentence disparities among defendants
      with similar records who have been found guilty of similar conduct (§
      3553 (a)(6)); and

4)    The need to provide restitution to any victims of the offense (§
      3553(a)(7)).

Accordingly, in *Rita v. United States*, the Supreme Court held that a District Court may

conclude that the Guidelines sentence does not properly reflect Section 3553(a)'s purposes and

factors, reflects unsound judgment, or does not treat individual characteristics properly. *Rita*, 551

U.S. 338, 347–57 (2007)[3]. And, in *Kimbrough*, the Supreme Court ruled that a sentencing court

may permissibly determine that a "within-Guidelines sentence is 'greater than necessary' to serve

the objectives of sentencing" under Section 3553(a). *Id.* at 91. Moreover, the *Kimbrough* Court

further noted that even the Government has conceded that sentencing judges could vary from

---

[3] Moreover, a court of appeals may not apply a presumption of unreasonableness to a sentence outside the Guidelines range. *Id.* at 355. Subsequent to its decisions in *Booker* and *Rita*, the Supreme Court of the United States decided two other cases, *United States v. Gall*, 522 U.S. 38, 128 S.Ct. 586 (2007) and *Kimbrough v. United States*, 522 U.S. 85 (2007), that provide additional guidance for district courts in fashioning appropriate sentences. In *Gall*, the Supreme Court applied an abuse-of-discretion appellate standard in reviewing the district court's sentence for reasonableness and upheld the sentence. *Id.* at 591. In settling upon the abuse-of-discretion standard, the *Gall* Court rejected "an appellate rule that require[ed] 'extraordinary' circumstances to justify a sentence outside the Guidelines range . . . [as well as] the use of a rigid mathematical formula that uses the percentage of departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* at 595. The court reasoned that either standard would cut too close to imposing an impermissible presumption of unreasonableness for a sentence outside the Guidelines range. The Court in *Gall* ultimately emphasized that the sentencing judge is in the best position to determine facts and judge their weight under § 3553(a) on a case-by-case basis. *Id.* at 597.
    In *Kimbrough*, the defendant pleaded guilty to drug charges including conspiracy to distribute, and possession with intent to distribute, crack cocaine. *Kimbrough*, 522 U.S. at 91–92. Under the Guidelines, the defendant was facing a sentence of 228 to 270 months, but the district court imposed a sentence of 180 months due, in part, to the disparity in the Guidelines' treatment of crack versus powder cocaine. *Id.* at 93.The Supreme Court upheld the sentence as reasonable in light of the abuse-of-discretion standard of review. *Id.* at 110–11. In the particular case before it, the *Kimbrough* Court rejected the notion that a deviation from the Guidelines' crack to powder ratio of 100:1 was *per se* unreasonable. *Id.* at 108.

Guideline sentences solely based on policy considerations, "including disagreements with the Guidelines." *Id.* at 101 (internal quotation omitted).

### A. The United States Court of Appeals for the Third Circuit

The Third Circuit in *United States v. Gunter*, 462 F.3d 237 (3d Cir. 2006) has clarified the sentencing procedure to be followed in light of *Booker*. The procedure to ensure that a sentence is sufficient but not greater than necessary to comply with the purposes set forth in § 3553 entails three-steps:

1)   Courts must first calculate a defendant's Guidelines sentence;

2)   In doing so, Courts must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation; and

3)   Finally, Courts are to exercise their discretion by considering the relevant Section 3553 factors in setting the sentence, regardless of whether it varies from the sentence calculated under the Guidelines.

*Id.* at 247; *see also United States v. Ali*, 508 F.3d 136, 142 (3d Cir. 2007) (citing *Gunter*, 462 F.3d 237).

### B. The United States District Court, District of Delaware

Moreover, as Your Honor is well aware, the Federal District Court for the District of Delaware has granted downward variances when appropriate, even when those variances are opposed by the Government. In fact, in fiscal year 2017, the Federal District Court for the District of Delaware gave below Guidelines range sentences, that were not "sponsored" by the Government, in 28.6% of all cases (which is more than 10% higher than the national average of 17.8%). (*See* Ex. P, table 8). In fact, in 2017, only 29.8% of defendants sentenced by the Federal District Court for the District of Delaware were given Guidelines range sentences (unlike the national average of 49.1%). (*See* Ex. P, table 8).

II.    The Sentencing Guidelines

   *A.  Guidelines Calculation*

   Pursuant to the United States Sentencing Guidelines, Kristian has a base offense level of 18 pursuant to Section 2A6.2(a).  And, because the offense involved a "pattern of activity involving stalking, threatening, harassing, or assaulting the same victim (Victim 1), a two-level enhancement is appropriate pursuant to Section 2A6.2(b)(1).  In addition, a three level reduction under Sections 3E1.1(a) and 3E1.1(b), due to Kristian's affirmative acceptance of responsibility, is also appropriate.  Accordingly, the applicable Guidelines offense level is a 17, which corresponds with a Sentencing Guidelines range of 24-30 months.

   This was the Guidelines range that both Kristian and the Government believed was applicable at the time the Government drafted the plea agreement and Information, at the time Mr. O'Hara executed the plea agreement and at the time of his guilty plea.

   ***B.  The PSR is Incorrect with Regard to Application of Grouping Principles***

   *1.  The PSR*



   *2.  The Appropriate Analysis*

   In *United States v. Hersh*, 297 F.3d 1233 (11th Cir. 2002), the Eleventh Circuit explained that while U.S.S.G. § 1B1.2(d) allows a sentencing court to treat a conspiracy as separate counts, it may do so only when the defendant "is convicted of a multi-object conspiracy."  The conspiracy

16

charged here was not a multi-object conspiracy because of the express language of the cyberstalking statute: 18 U.S.C. § 2261A(2)(B).  The statute criminalizes harassing or intimidating conduct that causes, attempts to cause, or is reasonably likely to cause substantial emotional distress to the target and/or her spouse and/or her immediate family.  Here, all of the cyberstalking conduct was designed to impact Victim 1, but was likely to cause substantial emotional distress to Victim 1, as well as her parents (Victims 2 and 3).

While true that Kristian did conspire for Co-conspirator 1 to leave two harassing voicemails on the answering machine at Victim 1's childhood home where her parents lived regarding Victim 1 (one of which was directed to Victim 1), and conspired to send food orders to Victim 1's childhood home where her parents lived, and conspired to engage in spoofing such that it appeared that Victim 1's cellular telephone was calling the residential telephone number of her childhood home where her parents lived, all of the conduct was designed to impact Victim 1.  Even the language in the Information makes clear that the conduct involving Victim 1's childhood home was "targeting Victim 1."

Thus, Victim 2 and Victim 3 are clearly secondary victims. Application Note 2 to U.S.S.G. § 3D1.2 makes clear that the term "victim," for purposes of grouping, "is not intended to include indirect or secondary victims."  The Note further explains that, for purposes of grouping: "Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim."  The Note goes on to explain that "[a]mbiguities should be resolved in accordance with the purpose of this section as stated in the lead paragraph, *i.e.* to identify and group "counts involving substantially the same harm."

Here, to be clear, the cyberstalking statute explicitly permits Victim 1's parents (Victims 2 and 3), as members of her immediate family, to be impacted by the cyberstalking behavior, and

17

thus, be secondary victims. However, because Victim 2 and Victim 3 are secondary victims, it is clear that Kristian did not plead guilty to a conspiracy to engage in three separate counts of cyberstalking. Furthermore, as stated above, any ambiguities should be resolved in favor of the above-analysis, because the harm to Victim 1 and her parents was the same.

Thus, the conspiracy cannot be viewed as a conspiracy to multiple counts of cyberstalking, and therefore, U.S.S.G. § 3D1.4 is inapplicable to this case.

3.  *Victims 2 and 3*

Furthermore, even if it were the case that Kristian engaged in a conspiracy to commit more than one count of cyberstalking (which it is not), the alleged conduct involving Victim 2 and Victim 3 cannot be viewed as separate counts because the alleged conduct involving Victims 2 and 3 is indistinguishable. The conduct directed to the childhood home of Victim 1, and thus, arguably directed at Victims 2 and 3, was at all times identical. None of conduct that was directed at Victim 1's childhood home was specifically directed at Victim 2 or Victim 3. Moreover, no conduct was directed at Victim 2 separate and apart from Victim 3, and no conduct was directed at Victim 3 separate and apart from Victim 2. At worst, Victim 1's childhood home, and as such, her parents, can constitute only one object of the conspiracy separate and apart from Victim 1. Thus, even if one were to wrongly treat the conspiracy as a multi-object conspiracy, Victims 2 and 3 cannot be treated as separate objects of the conspiracy.

4.  *The United States District Court, District of Delaware*

Kristian is unaware of any cyberstalking cases in the District of Delaware, even those that pertain to the cyberstalking of multiple victims, such as in *United States v. Yung*, discussed in detail below, where the Court has applied this enhancement. Yung engaged in atrocious acts of cyberstalking against a man who interviewed him for law school admissions, that man's wife and

that man's son. (*See* Ex. Q, Y). However, this enhancement was not even contemplated since Yung was not charged with a conspiracy. It would be fundamentally unfair for Kristian to receive a substantially greater guideline calculation than Yung, despite engaging in substantially less atrocious behavior, simply because Kristian plead guilty to a conspiracy charge, as opposed to a substantive count.

## III.   A Substantial Variance is Appropriate to Avoid Unwarranted Sentencing Disparities

Kristian respectfully requests that this Court grant a substantial variance from the United States Sentencing Guidelines range determined by Your Honor and sentence him to time served, probation with mandatory mental health counseling, alcohol treatment, significant community service and installation of monitoring software on all electronic devices, as well as the payment of full restitution.

### A.   A Variance to a Non-Custodial Sentence is Permissible

18 U.S.C. § 3553(a)(1) requires that a Court consider the sentences available to it. Here, a non-custodial sentence is available.

The Supreme Court has held that the District Court judge may not presume that the Guidelines range is reasonable. *Gall*, 552 U.S. at 49–50. Rather, the sentencing judge "must make an individualized assessment based on the facts presented," and, if the court decides to deviate from the Guidelines, the judge "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance." *Id.* at 597. Furthermore, the Third Circuit adopts a "deferential standard" when reviewing a § 3553(a) determination because the trial court is "in the best position to determine the appropriate sentence in light of the particular circumstances of the case." *U.S. v. Cooper*, 437 F.3d 324, 330 (3d Cir. 2006). Section

3553(a)(3) is intended to accord "flexibility" to sentencing judges by "provid[ing] alternatives to incarceration where necessary . . . ." *United States v. K*, 160 F.Supp.2d 421, 431 (E.D.N.Y. 2001).

Accordingly, courts have found that a variance to a non-custodial sentence is not prohibited when the Guidelines call for imprisonment. In *United States v. Wadena*, the court explained:

> Such a rule would amount to the judicial elimination of a sentencing option that would otherwise be available under Federal criminal statutes that do not impose mandatory imprisonment, including the statute at issue in this case. This judicial rule would effectively require imprisonment for defendants whose offense level falls within Zone B or above within the sentencing table of the Guidelines. That kind of categorical, mandatory approach to sentencing on the basis of judicially-found facts is precisely the type of sentencing regime the Supreme Court rejected in *Booker*.

470 F.3d 735, 738 (8th Cir. 2006). Because non-custodial sentences are not eliminated from the Court's sentencing options, imposition of an alternative to incarceration is appropriate when called for by the unique facts of a particular case. *See also* 18 U.S.C. § 3553(a)(1) (the Court should consider the sentences available).

### B. *A Substantial Variance is Necessary to Avoid Unwarranted Sentencing Disparities*

A substantial variance from the Guidelines range is necessary to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). As the Third Circuit has explained: "the purposes of § 3553(a)(6) is to promote national uniformity in the sentences imposed by federal courts." *United States v. Begin*, 696 F.3d 405 (3d Cir. 2012) (citing *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006)).

*1.   United States District Court, District of Delaware*

In the District of Delaware, in the only two cases that are even arguably similar to Kristian's both in conduct and the defendants' criminal and personal histories, have resulted in sentences that involved no additional incarceration. These two cases are discussed below.

*a.   United States v. Upadhyay*

In *United States v. Upadhyay*, Crim. No. 08-118-JJF (D. Del. 2008), Mr. Upadhyay engaged in an approximate one year campaign of "stalking, threatening to harm and harassing victim A.G. and her parents, M.G. and S.G. – all in an effort to make A.G. fear for her safety after she had ended a relationship with defendant." (*See* Ex. R).[4]  Mr. Upadhyay hacked into A.G.'s and her parents e-mail accounts to track A.G., called A.G. up to 40 times per day, called A.G.'s parents' house hundreds of time, including as many as 50 or more in the span of just a few days and traveled from the United States to Dominica where A.G. attended medical school to admittedly "scare" A.G.. (*See* Ex. R). Mr. Upadhyay also sent e-mails to A.G. threatening to physically harm her, as well as to tell her that he is following her every move. (*See* Ex. R).  In addition, even when the FBI told Mr. Upadhyay to stop contacting A.G., he continued to contact her. (*See* Ex. R).

While the United States Attorney's Office in Upadhyay advocated for incarceration, the Honorable Joseph J. Farnan sentenced Mr. Upadhyay to 36 months of probation, and ordered him to pay full restitution. (*See* Ex. V).

Mr. Upadhyay's conduct is undisputedly more egregious than that of Kristian's. Mr. Upadhyay explicitly threatened in an e-mail to A.G. that he was going to physically harm A.G. Kristian never explicitly threatened Victim 1.

---

[4] Mr. Upadhyay entered a guilty plea to two counts of unauthorized access of a computer in violation of 18 U.S.C. § 1030(a)(2)(C). (*See* Ex. V).

Mr. Upadhyay traveled to Dominica to "scare" A.G.. Kristian never randomly showed up at a location where Victim 1 was.

Mr. Upadhyay did not stop contacting A.G., even after the FBI told him to stop. Kristian immediately stopped all conduct toward Victim 1 and her family in May 2018, as soon as he was contacted by the FBI.

Accordingly, to avoid an unwarranted sentencing disparity between Kristian and Mr. Upadhyay, Kristian should not receive a sentence of further incarceration.

> b. *United States v. Castro*

Similarly, the case of *United States v. Castro*, Crim. No. 15-47-LPS (D. Del. 2014), also supports the conclusion that Kristian should not receive a sentence that involves further incarceration. Castro was a University of Delaware Custodial Department employee until she was terminated from her position in September 2011. (*See* Ex. S). Over the course of two years, Castro sent numerous anonymous harassing and threatening letters to her former coworkers after her termination. (*See* Ex. S). For example, in one, Castro drew a tombstone on a note card, wrote the recipient's name on the tombstone and included the recipient's year of birth and projected year of death, 2014. (*See* Ex. S). Castro also wrote that "as things get worse for me the more you need to worry I'm almost there." (*See* Ex. S). In another letter, Castro again drew a tombstone, which included the year of birth and projected date of death, 2014, of the recipient, and contained the same threatening language quoted above. (*See* Ex. S).

In another letter in October 2013 to another former coworker, Castro instructed the recipient to provide the following warnings to Castro's other former coworkers:

> Tell [A] I hope she doesn't get run over by a car (see ya). Tell [B] if she gets killed, the one person who won't give a damn, will be her husband. She won't be alive to force him to care. Tell [C] I hope her heart stops. **before I decide to come for her.** Tell [D] it will be a pleasure to **shut her loud mouth for good, so she no longer creates havoc her co-workers. The countdown is**

near. They better hope for the best or **I will come for each one of the people listed.** I send this message to make them think about what they have done, and how their actions ruined my childrens lives. I will be doing this for them and **don't care about spending the rest of my life in prison or put to death. I promise, if not all of them, at least one** . . . Also tell [E], the Director, the next time he removes an employee, try to collect the uniforms, if possible.

[(*See* Ex. S).]

In yet another letter Castro sent to a former coworker in February 2014, Castro stated "Almost there []! Ur gonna wish u had run my ass over with your car []! Some just snap!" *Id.* at 4. Castro kept a list of coworker's names and vehicle registrations, and, on the day the government executed a search warrant, Castro had purchased a semi-automatic handgun and 100 rounds of ammunition using monies from the sale of her car.  (*See* Ex. S).  Despite making multiple death threats, as well as purchasing a firearm and ammunition, Castro was sentenced to time-served (approximately 10 months during which she underwent a psychiatric evaluation and treatment). (*See* Ex. W).

Castro's conduct is indisputably more egregious that Kristian's.  Castro made repeated death threats over a prolonged period of time.  Kristian never made any death threats.  Castro also clearly intended to harm her victims, as demonstrated by the fact that she sold her only means of transportation to purchase a handgun and rounds of ammunition.  Yet, here there is no indication that Kristian actually intended to harm Victim 1.[5]

Again, because Kristian's conduct clearly was not as abhorrent as Ms. Castro's, he too should not receive additional incarceration.

   *c.   Other District of Delaware Cases Are Dissimilar*

While other defendants who have engaged in cyberstalking conduct in the District of Delaware have been sentenced to periods of incarceration, none are similar in terms of conduct

---

[5] That Kristian wrote two text messages to the Beast Mode chat group, at 2am, while extremely intoxicated, does not sufficiently demonstrates that he intended to harm Victim 1.

and/or criminal history. This is because all of the other cases involve defendants with extensive violent criminal histories and/or conduct that is far more severe than Kristian's and generally included clear death threats or actual death. Below is a discussion of those cases.

> i.    *United States v. Matusiewicz, et al.*

*United States v. Matusiewicz*, Crim. No. 13-83, involved the cyberstalking of Christine Belford by her ex-husband David Matusiewicz, and his mother and sister, Lenore Matusiewicz and Amy Gonzalez, respectively. 905 F.3d 165 (3d Cir. 2018). David Matusiewicz and Lenore Matusiewicz kidnapped David's three daughters during a bitter custody battle with Belford in 2006. David, Lenore and the three girls were located in a tiny Nicaraguan village a year-and-a-half later. *Id.* David and Lenore pled guilty to kidnapping and were sentenced to prison. *Id.* Once in prison, David launched his family's campaign against Belford, which ultimately resulted in David's father shooting and killing Belford, her friend, and himself, as Belford was entering a courthouse to attend a child support hearing in 2013. *Id.* David and Amy received life sentences after being found guilty at trial for their cyberstalking conduct; their mother Lenore died in prison in 2016. Plainly stated, one cannot compare Kristian's personal history or conduct to the personal characteristics and conduct of the defendants in *Matusiewicz*.

> ii.   *United States v. Generette*

Kristian's personal history and alleged conduct is also clearly distinguishable from the defendant's conduct in *United States v. Generette*. Crim. No. 13-50 (SLR). In the first instance, Generette had an extensive "violent history," including assaulting the victim and her daughter. After serving a prison sentence for these offenses, defendant made almost 900 telephone calls over a period of weeks to the victim, during which he threatened to injure and kill her. (*See* Ex. U).

Generette's prior violent conduct also included an armed robbery wherein he lynched a victim, a separate armed robbery wherein he pistol-whipped a victim, an escape from a detention facility, stalking another woman, as well as strangling yet another woman. (*See* Ex. U).

While Mr. Generette was sentenced to a period of incarceration, neither his conduct, nor his criminal history, are at all similar to Kristian's.

### iii.    *United States v. Yung*

Finally, Kristian's conduct is not nearly as severe as Mr. Yung's in *United States v. Yung*, Crim. No. 17-14-LPS. As the Government stated in its sentencing memorandum in the *Yung* case: "Yung published false, violent and sadistic statements about his victims on the Internet — including descriptions of rape, lynching, sexual molestation, and graphic violence. Moreover, Yung repeatedly posted personal ads on Craigslist and other websites with the intent that individuals interested in violent and sadistic sexual activity would go to the victims' residence in the middle of the night." (*See* Ex. Q pg. 2). On more than one occasion, strange men came to the victims' home for the purpose of having violent sexual encounters, including acting out rape fantasies, with his primary victim's wife. (*See* Ex. Q pg. 2-4). Yung also placed information on the internet that the primary victim had sexually assaulted and molested people, including by abducting and raping an eight-year old girl, and that the primary victim was a bigot and a member of the KKK. Yung also posted an obituary on the internet for the primary victim. (*See* Ex. Q pg. 15).

It is without question that Yung's conduct is far more egregious than Kristian's. Yung tried to ensure that people arrived at the victims' home and raped the primary victim's wife. And, Yung publicly posted that his primary victim had raped an 8 year old girl. Such conduct is not comparable to Kristian's.

In addition, unlike Kristian, Yung also: (1) attempted to tamper with a witness during his bail hearing, demonstrating a complete lack of respect for the judicial system (*See* T, pg. 3); (2)

apparently failed to seek mental health treatment after he was arrested (*See* Ex. X); and (3) continued his cyberstalking conduct even after he was made aware of an investigation into his conduct (*See* Ex. T pg. 8). Moreover, unlike Kristian, it appears that Yung is still fighting certain amounts of the restitution sought by the victims of his conduct. (*See* Ex. Y).

Yung's extreme conduct, as well as his personal characteristics, cannot be compared to that of Kristian's. Accordingly, their sentences should not be comparable.

In light of the above, because similarly situated defendants with similar criminal histories have not received sentences of additional incarceration, Kristian should not either. This is necessary to avoid unwarranted sentencing disparities in the District of Delaware for similarly situated defendants, as required by 18 U.S.C. § 3553(a)(6).

2. *Co-conspirator 1*

The Third Circuit has also made clear that "[a]lthough § 3553(a) does not require district courts to consider sentencing disparity among co-defendants, it also does not prohibit them from doing so." *Parker*, 462 F.3d at 277. Accordingly, the Third Circuit has explained that "[w]here appropriate to the circumstances of a given case, a sentencing court may reasonably consider sentencing disparity of co-defendants in its application of those factors." *Id* at 278. These circumstances include "where co-defendants are similarly situated." *Id.*

Here, Kristian and Co-conspirator1 were almost identically situated, however, Co-conspirator 1 has not been charged with any crime. In order to avoid such a tremendous disparity between the outcome for Co-conspirator 1 and the outcome for Kristian, Kristian should not be sentenced to an additional term of imprisonment.

Kristian and Co-conspirator1 attended the same high school, and started conspiring to engage in cyberstalking conduct, as set forth in Exhibit B, at a young age. Both were involved in the harassing conduct of Victims 1 – 8, as set forth in Exhibit B, oftentimes with Co-conspirator 1

26

as the primary actor. For example, it is not disputed that Co-Conspirator 1 engaged in the following overt acts: (1) left two voicemails on the answering machine of Victim 1's childhood home, one in which he indicated that his name was Marcus Halberstram; (2) sent cash-on-delivery food orders to Victim 1 and others;[6] (3) utilized prank owl to call Victim 1's cellular phone multiple times per day; (4) made harassing telephone calls to others; (5) created fake LinkedIn accounts and sent harassing messages through LinkedIn; and (6) discussed with O'Hara at length, via text message, his harassing conduct. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In fact, it appears that the only conduct that Co-conspirator 1 was not actively involved with was the creation of a username for Victim 1 on FreeChatNow.com and signing Victim 1's e-mail up to receive spam mail.

Moreover, Co-conspirator 1 sent text messages indicating a desire to engage in violent conduct. Co-conspirator 1 made statements via text message: "i think i'm going to get drunk one of these night and commit arson," and "I'll burn down that bar in Saratoga with those cunts who laughed at us." Yet, Co-conspirator 1 was never arrested and has not been charged with criminal conduct, and thus, will not be serving any time in jail, will not have a permanent criminal record, will not have any restrictions on his freedom and will not have to pay restitution or a fine.



[6] ▮▮▮▮▮▮▮▮▮▮ Records obtained from Grubhub and Windstream confirmed the Grubhub orders used in the [Victim 1] cyberstalking campaign originated from an IP address associated with the unindicted co-conspirator. The IP address was connected to the apartment complex where the unindicted co-conspirator resided while attending school."



### 3. *Other Similar Federal Cases*

Moreover, the sentence proposed is certainly in line with sentences imposed in other cases by Federal District Courts in other districts.  For example, we would specifically direct the Court's attention to *United States v. Nagel*, 2011 WL 4025715 (E.D.N.Y. Sept. 9, 2011).  Charles Nagel was convicted after a trial of cyberstalking a celebrity and her family members in violation of 18 U.S.C. § 2261A(2).  While the Court found that Mr. Nagel's Guidelines offense level was a 22, and that he had a criminal history category of II, the Honorable Jack B. Weinstein sentenced Mr. Nagel to "five years' probation with continued intensive psychological treatment." *Id.* at *1.  His sentence further required that "[h]is treating professional [] be under a duty to report any determination or threat of future stalking behavior." *Id.* at *1.  Furthermore, Judge Weinstein ordered restitution in the "amount of $42,838.38 owed to defendant's chief victim for expenses caused by defendant's criminal acts." *Id.* at *1.

Judge Weinstein explained that the defendant had already spent 105 days in prison, had been on house arrest with electronic monitoring for fourteen months, and was saddled with restitution payments which would have a "continuing deterrent effect." *Id.* at \*4. However, it appears that Judge Weinstein was most moved by the fact that Nagel suffered from mental health problems that required continuous treatment and monitoring "for purposes of rehabilitation," and that "[t]reatment can generally be accomplished more effectively outside of prison than it can in prison." *Id.* (citing *United States v. Brennan*, 468 F.Supp. 2d 400, 408 (E.D.N.Y. 2007)).

Thus, like in *Nagel*, Kristian should be sentenced to time served with mandatory mental health counseling. Such a sentence will prevent an unwarranted sentencing disparity between Kristian and Mr. Nagel. *See* 18 U.S.C. § 3553(a)(6).

**IV.   A Substantial Variance is Appropriate because Kristian has Demonstrated a Commitment and Ability to Refrain from ever again Engaging in such Conduct**

The history and characteristics of Kristian must be considered by the Court, pursuant to 18 U.S.C. § 3553(a)(1). Here, Kristian's personal history and characteristics weigh in favor of a non-custodial sentence because it is clear that Kristian does not represent a threat to the public. *See* 18 U.S.C. § 3553(a)(2)(C) (emphasizing that the Court must consider protection of the public when fashioning the appropriate sentence).

Kristian has taken full responsibility for his abhorrent conduct. He has repeatedly expressed remorse, shame and empathy.

Prior to this offense, Kristian had an unblemished record, a commitment to charitable endeavors, and an incredibly bright future. Once arrested, Kristian was detained for 28 days at Brooklyn MCC and then Philadelphia MCC. During a heated detention hearing, at the conclusion of which Judge Burke ordered Kristian's release with strict conditions, the Government averred

that there were no combination of factors that could ensure the public safety if Kristian were released from custody. The Government was wrong.

Kristian and his family have gone above and beyond to comply with the incredibly stringent restrictions placed on Kristian, which included: (1) home detention; (2) the inability to utilize any telephone, the internet, or any computer or similar electronic device (like an iPad); (3) the inability to sit outside of his home on the back patio of his house; and (4) the inability to be left home alone with any telephones or computers in the home. (*See* PSR ¶ 15-16). Despite these incredibly onerous restrictions, Kristian complied fully, which demonstrates his ability to control himself. (*See* PSR ¶ 17).



Furthermore, once released from custody, Kristian ███████████████████████████ ██████████████████████████████████████████████████████ (*See* Ex. A, B, G, H). Through his work with ████████████ his parents and ████████████, Kristian has demonstrated that he understands that what he did was horribly wrong, and has developed tools to ensure that nothing remotely like the conduct at issue here ever happens again. (*See* Ex. A, B, G, H). This is exemplified by the fact that Kristian has demonstrated that he is completely capable of modifying his behavior through compliance with the incredibly stringent terms of his release. (*See* PSR ¶ 15-17). Moreover, as discussed above, ████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████

Kristian, now just 24 years old, will feel the effects of a federal conviction for the rest of his life. He will forever experience the deleterious collateral consequences of his conviction, including, but not limited to, his ability to obtain employment, as well as licensing and bonding.

In addition, the facts of his conduct will forever haunt him, both personally and professionally, as they are easily accessible through a simple Google search of his name.

There is simply no risk of recidivism, and accordingly, no need to further incarcerate Kristian.[7]



---

[7] Any argument that the Government tries to make that it believes Mr. O'Hara is a danger, and therefore, must be incarcerated is belied by the fact that the Government never prosecuted Co-conspirator 1 despite that Co-conspirator 1 was equally responsible for the conduct at issue, had sent text messages stating a desire to commit violence and is



## VI.   Kristian Has Been Punished

Kristian has been punished and will continue to be punished for his criminal conduct.  First, Kristian was incarcerated for 28 days in two federal facilities.  Such incarceration punished Kristian for his criminal conduct.  Second, by the time of the sentencing hearing, Kristian will have effectively been on lockdown for thirteen months without the ability to use a telephone, the internet, computers, or even enjoy the outdoors.  He has been effectively cut off from the public at large.  While the purpose of such lockdown was not to punish Kristian, but rather to protect the public, make no mistake, such restrictions have punished him for his conduct.[8] *See Nagel*, at *4.

In addition, Kristian, who had a very bright future, will now be carrying with him a felony conviction for conspiracy to commit cyberstalking, the facts of which are splashed across the Internet.  This felony conviction will hamper his job prospects, as well as his personal endeavors, for the rest of his life.  Accordingly, Kristian has been and will continue to be punished.

There is no need to punish him even further through further incarceration.  Accordingly, a sentence of time served and probation with mandatory mental health treatment, significant

---

[8] Kristian is generally home alone Monday through Friday from 7am until 4pm.  During this time he is not able to communicate with anyone.  He cannot utilize a telephone except in very limited circumstances when one of his parents is home; he is not able to utilize electronic devices; and he is not even able to go for a walk.  By the date of his sentencing, he will have been under such lockdown for a total of 384 days.

community service and installation of monitoring software on all electronic devices will more than

provide a just punishment for the offense, pursuant to 18 U.S.C. § 3553(a)(2)(A).



IX.    **General Deterrence**

Finally, the Government may argue that further incarceration is necessary to deter the public at large from engaging in cyberstalking conduct.  However, as Judge Weinstein noted in *Nagel*, sentencing a cyberstalking defendant like Mr. Nagel and Kristian to time served, restitution and probation with a requirement for intensive mental health treatment "will send a clear message that any activity constituting interstate stalking will result in a substantial penalty." *Nagel*, 2011 WL 4025715, at *5. *See also* 18 U.S.C. § 3553(a)(2)(B) (requiring the Court to consider whether the sentence will afford adequate deterrence to criminal conduct).  Furthermore, even the National Institute of Justice, which is the research, development and evaluation agency of the United States Department of Justice, has explained that consistency in detecting and punishing criminal conduct, as opposed to the length of the sentence imposed, are the real deterrent factors for the public at large. *See National Institute of Justice, Office of Justice Programs,* "Five Things About Deterrence." https://nij.gov/five-things/pages/deterrence.aspx (last visited July 24, 2019).

Kristian has been prosecuted, and Kristian has been and will continue to be punished. Additional incarceration will not lead to greater general deterrence.

## CONCLUSION

We respectfully submit that, following the foregoing rulings of the United States Supreme Court and the Third Circuit, as well as applying the Section 3553(a) factors, demonstrates that an appropriate, but not greater than necessary sentence, is: (1) time served; (2) probation with mandatory mental health counseling, alcohol treatment, extensive community service and installation of monitoring software on all electronic devices; and (3) full restitution.

Respectfully submitted,

MICHAEL CRITCHLEY
AMY LURIA
**CRITCHLEY, KINUM & DENOIA, LLC**
75 Livingston Avenue, Suite 303
Roseland, New Jersey 07068
(973) 422-9200

Dated: July 29, 2019