**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Criminal Action No. 19-23-CFC |
| KRISTIAN JAMES O'HARA, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

"Can't really do anything about it.  Except torture em." - Kristian O'Hara, 12/18/16.

He wanted to torture her and he did.  For eighteen months, the Defendant Kristian James O'Hara ("O'Hara") inundated Victim 1 and her parents with late-night food orders, spoofed phone calls, alarming voicemails, and sensitive emails to her work address.  Then, because his torment had not devastated her sufficiently, he posted her name and number on a sex-chat website.  She awoke to sexual invitations from strangers.

Between the start of the FBI's investigation in May 2018 and O'Hara's arrest in late July 2018, the FBI learned two critical facts: 1) Victim 1 and her parents were not the only victims whom O'Hara cyberstalked over a multi-year period, and 2) O'Hara intended and relished every moment of anguish that his victims suffered.

O'Hara asks this Court to believe that he has sufficiently accounted for his crimes through a year of home confinement and Internet restrictions.  But the sentencing factors this Court must consider under 18 U.S.C. § 3553(a) – including the properly calculated Guidelines range– all herald a significant sentence of incarceration for the harm intentionally inflicted.  A sentence of probation completely ignores the severity of the offense and the harm suffered by multiple victims; it also seeks a wholesale abandonment of the Guidelines.  In order to properly

punish O'Hara for the harm he caused, the government recommends a slight variance to a sentence of 30 months' incarceration.[1]

## I.      FACTUAL BACKGROUND OF OFFENSE

### a.  O'Hara Cyberstalked Victims 1, 2, and 3 for Eighteen Months

O'Hara's charged conspiracy offense was an 18-month cyberstalking campaign directed at Victim 1 and her parents, Victims 2 and 3.  The government set forth much of the relevant conduct targeting these victims from December 2016 through May 2018 in its previously filed papers.  *See* D.I. 30 & 33-1; *see also* Amended Presentence Report dated July 3, 2019 (hereinafter, "PSR") ¶¶ 30-93.

Stalking offenses like the ones perpetrated by O'Hara cannot be understood through isolated acts.  It is the aggregation of small acts designed to make a victim feel isolated, fearful, and helpless that inflicts the harm acutely felt by Victim 1 and her parents.   And as learned through his own words, O'Hara intended that harm with a clarity of purpose seldom witnessed. The following table lines up several (but not all) instances of O'Hara's conduct toward Victims 1 through 3, his expressed intent, and the feelings of helplessness, fear, and isolation they suffered.

---

[1] As it does with every Sentencing Memorandum, the government files a Sealed Attachment A.

| Act[2] | Intent | Impact |
|---|---|---|
| **December 18- 19, 2016** | | |
| • Directed multiple cash-on-delivery food orders to Victim 1's apartment in New York City over the course of one night<br><br>• Sent food orders to workplace of Victim 1's boyfriend<br><br>• Sent food orders to Victim 1's workplace<br><br>• Called Victim 2 and 3's home phone number from Victim 1's cell phone number late at night (Dec. 2016) | • "That c*nt posted an [Instagram] with some dude at a [firm] holiday party"[3] Ex. A at 3928[4]<br><br>• "I've already located the dude on social media.  Have his home phone number and address" *Id.* at 3930<br><br>• "Word let's send it to her apartment now and then I'll give you the [work] address in the morning tomorrow" *Id.* at 3935<br><br>• "Can't really do anything about it. Except torture em" *Id.* at 3936<br><br>• "56 worth of g*ok food to Philly" [where her boyfriend worked] *Id.* at 3940 | • "Since December of 2016, I've lived in fear; for my safety and the safety of those close to me"<br><br>• "I fear the sound of my doormen buzzing up to my apartment, thinking it's another unwanted food order or worse, someone unwanted trying to find and get to me"<br><br>• Victim 2 –"She was exhausted because she couldn't sleep plus her apartment was being called constantly during the night from the doormen."<br><br>• Victim 2 feared her daughter was being held hostage |
| **December 20, 2016** | | |
| | • "She put up a snap of a cracked egg last night with the caption 'An accurate representation of my life the past two weeks'  lmfaoooo" *Id.* at 3970<br><br>• "F*cking c*nt lmao at least we know we're getting to her" *Id.*<br><br>• Co-Conspirator observed it would be hard for her to change her | |

---

[2] All acts were done by either O'Hara or Co-Conspirator 1 in the course of the conspiracy.

[3] O'Hara, of course, did not edit his own language in text.

[4] Exhibit A is an excerpted set of text messages between O'Hara and Co-Conspirator 1.  The original file was over 7000 pages long.  The text messages are organized by date, from June 2016 through May 2018, and there are page numbers from the original file (e.g., 2801 … 2816) at the bottom right-hand corner that the government cites for ease of reference.  The government also highlights the relevant language referenced in this memorandum.

| Act[2] | Intent | Impact |
|---|---|---|
| | number because of her career and contacts: "Yeah that's true.  Plus the hassle of it too.  … And then I would just ask around for the new one.  AND BANG BACK AT IT AGAIN" *Id.* at 3987 | |
| **December 23 - 27, 2016** | | |
| • Spoofed calls to Victim 1's personal cell phone number throughout the day (Dec. 2016)<br><br>• Used Victim 1's cell phone number and name in connection with food orders sent to others | • "I THINK SHE CHANGED HER NUMBER" *Id.* at 4047<br><br>• "'Hacked' hahahaha … She's clueless" *Id.* at 4049<br><br>• "She must have been furious dude … That's twice she's mentioned it on social media" *Id.* at 4073 | • Victim 1 changed the phone number she had used since childhood |
| **January 4, 2017** | | |
| • Continued to send multiple food orders continued to arrive at Victim 2 and 3's house (Jan. 2017)<br><br>• Called Victim 2 and 3's home phone number from spoofed numbers, including Victim 1's old number | • "You think her parents need a birthday meal?"  *Id.* at 4187<br><br>• "But I'm saying we send food to her house … For her birthday … From [her boyfriend]" *Id.* | • Victim 3 spent weeks calling and emailing GrubHub, trying to get them to block food orders from being delivered, to no avail<br><br>• Victim 1 reported the conduct to the NYPD, who turned her away |
| **March 6, 2017** | | |
| • Sent Victim 1 a food order at her work address in New York | • "If I give you [VICTIM 1's] work number, will you order her a pizza to her job?" *Id.* at 4464<br><br>• "As close to $50 as possible.  … She'll be appalled" *Id.* at 4465 | |
| **October 26, 2017** | | |
| • Left a voicemail on Victim 2 and 3's machine impersonating the dentist  at 1 a.m. (Co-Conspirator 1 with O'Hara on the call) | • "I have a fantastic idea for a prank call … [Victim 1] is home tonight because she's getting her wisdom teeth removed according to her Snap story … We call as the dentist's office saying we have to reschedule … Even if she realizes | • "I worry for my parents back home and the harassment that they've endured from unwanted food deliveries and traumatizing phone calls and voicemails and how those will affect them moving forward – every time there is a knock on the door or the phone rings, they |

| Act[2] | Intent | Impact |
|---|---|---|
| | we aren't the dentist, she's gonna be like WTF" *Id.* at 5736 | automatically panic for both their own safety and mine, even with me living hundreds of miles away" |
| **November 24, 2017** | | |
| • Left a voicemail on Victims 2 & 3's machine (Co-Conspirator 1 with O'Hara on call) | • "Hi, this is Marcus Halberstram[5] from Pierce & Pierce, Mergers and Acquisitions Division. I have been trying to get in touch with your daughter for some time now. I think she might have blocked my phone number, but, um, she gave me chlamydia and I'm … I'm pretty upset about it. If someone could get in touch with me, my number is [redacted]. If not, just look up Halberstram, when you call. Um, appreciate it. Thank you." PSR ¶ 71 | •Victim 2: "We were all living in fear of what could happen next and we were all paranoid. Especially [Victim 1]. What this person was doing to [Victim 1] and myself and my husband was horrendous. The fear and anxiety that this person was inflicting into our lives daily, is hard for me to adequately describe and express to you. We were terrified for our daughter's safety" |
| **April 30, 2018** | | |
| • Invited Victim 1 out to a bar with his friends | • "How funny is it that Victim 1 thought all that food and shit was her ex? … Like that's f*cking hysterical." Ex. A at 6850 | |
| **May 10, 2018** | | |
| • Urged Co-Conspirator 1 to send bulk food orders to her apartment<br><br>• Signed Victim 1's work email address up for subscriptions to multiple websites, including porn sites<br><br>• Posted her name and number on a sex chat website<br><br>• Spoofed her phone numbers such that her work phone and | • "She lied to me twice… Didn't care … F*ck her … She thought last time was bad?" *Id.* at 6960 | • Victim 2 – "[Victim 1] called me at 6:00 am in the morning…. She was crying hysterically."<br><br>• "She was getting phone calls all through the night on her personal cell phone and she woke up to numerous disgusting and disturbing text messages from a sex chat room."<br><br>• "She was so worried she was going to lose her job because using your work email to sign up to porn sites is obviously a violation of her work policy code of conduct" |

---

[5] Marcus Halberstram is one of the characters in *American Psycho* that the lead psychopathic character impersonates.

| Act[2] | Intent | Impact |
|---|---|---|
| personal phone each rang with the other's number at the same time | | • Victim 1: "No one should have to endure the fear that has been instilled in me since December of 2016.  No one should have to deal with the issues trusting the way I do now."<br><br>• Victim 1 reported being unwilling to leave her apartment alone out of fear. |

Thanks to the FBI's rapid investigation and self-help measures taken by Victim 1, O'Hara ceased cyberstalking Victims 1 through 3 in May 2018.  Apart from alerting his father to an FBI call (his father then contacted a personal friend/retired FBI agent, *see* Ex. A at 7029),[6] O'Hara did not acknowledge his crimes to authorities, and he evaded further FBI calls.  He did not seek help.  Rather, he brainstormed workarounds ("We need to find another way to deal with people like her in the future" *see* Ex. A at 6995), and bragged about his exploits to a group of young men in July 2018.  *See* PSR ¶¶ 103 – 121 (describing his torment of Victim 1 to be "standard procedure").

Even if his acts toward Victim 1 paused, his anger did not.  As he wrote on July 15, 2018: "I WOULD LIGHT [VICTIM 1] ON FIRE IF GIVEN THE CHANCE."  "I WANNA BURN HER HOUSE DOWN."  PSR ¶ 102.

In the age of mass shootings and other senseless acts of violence,[7] the FBI could not take the risk that O'Hara would act on these intentions, as he had acted on others.  After reading these

---

[6] *Cf.* Def't Memo at 10 (citing the character reference of a retired FBI agent).

[7] Abby Ohlheiser, *Inside the Online World of 'Incels,' the Dark Corner of the Internet Linked to the Toronto Suspect*, WASH. POST (April 25, 2018) (discussing the "involuntary celibate" movement linked to terrorist Alek Minassian's decision to kill ten people in Toronto, Canada), *available at* https://www.washingtonpost.com/news/the-intersect/wp/2018/04/25/ inside-the-online-world-of-incels-the-dark-corner-of-the-internet-linked-to-the-toronto-suspect/.

messages on his seized cell phone, the FBI ordered Victim 1 to go home to Delaware for safety, and arrested O'Hara within days.

### b.  O'Hara Cyberstalked Other Young Women During this Time

Victims 1, 2, and 3 were not the only victims O'Hara sought to torment between 2016 and 2018.  While his methods and intensity varied, O'Hara displayed a pattern with respect to stalking victims: he utilized technology to acquire as much information about their lives as possible, then inundated them with unwanted communications, phone calls, or food orders, until they were forced to change their lives to escape the torture.  With the exception of Victim 1, who he knew the most about, O'Hara's torment generally ended when the victim changed a number.

For instance, Victim 7 was another young woman that O'Hara met at college in New York.  Like Victim 1, she did not reciprocate (or even know of) his romantic feelings.  In summer 2016, O'Hara and Co-Conspirator 1 barraged her with phone calls and messages that incorporated details O'Hara could have only known through their shared social media connections.  At O'Hara's direction, Co-Conspirator 1 called her and referenced details about her life and her friends, and referred to himself as "Marcus Halberstram."  O'Hara tracked her visit to a friend's house in Pennsylvania, and conspired to send a food delivery to that friend's house in her name.  O'Hara and Co-Conspirator 1 also used her name and number in food orders sent to others.  PSR ¶¶ 139-147. On August 24, 2016, they exchanged the following delighted messages:

> Co-Conspirator 1: [Victim 7] 1000% got calls last night.
>
> O'Hara: Had to have, almost impossible that she didn't
>
> Co-Conspirator 1: I'd pay to listen to those calls
>
> O'Hara: Good amounts of money too
>
> O'Hara: Cuz at this point, she's probably like WHAT THE F*CK
>
> Co-Conspirator 1: Oh she HAS to be FURIOUS

O'Hara: It followed her back to school.

Ex. A at 3166.  The next day, at midnight, they sent another food delivery in her name:

Co-Conspirator 1: [Victim 7] got that pizza son

O'Hara: If only we saw that scene lmfao

…

O'Hara: This is why men have it hard in today's world

O'Hara: Why can't women just be obedient?[8]

Ex. A at 3175, 3177.

Based on the harassment, Victim 7 changed her phone number in late August 2016.  The messages stopped, because as O'Hara later admitted to Co-Conspirator 1 later, he did not know her new number.  Ex. A at 5869.

As the PSR references, Victim 8 received similar treatment to Victims 1 and 7.  PSR ¶¶ 149-152. O'Hara met Victim 8 through his work at a law firm in New York City, and after she politely declined a social invitation, his actions toward her were short-lived but intense.  In June 2017, he signed her work email addresses for subscriptions to sites like PornHub.com, the Trump Campaign, Scientology, and Jehovah's Witness.  He and Co-Conspirator 1 sent up to 10 food deliveries in a single day to her apartment in New York City.  They spoofed her personal and work phone numbers so it rang frequently with unwanted calls.  She changed all of the contact information that she could to evade further contact, and described the experience as

---

[8] This was not a one-time observation.  On May 19, 2018, O'Hara wrote:

"I've had an epiphany … We don't have many close female friends because we realize interacting with them for anything other than sex is totally pointless and not worth our time and effort … Logically, we have determined that it's too much to actually pretend to care about what they're saying so we just don't do it."  Ex. A at 7036.

"traumatizing."  Meanwhile, he was delighted to learn that they had forced her to change her number after only a day of bombarding it.  Ex. A at 5165.

### c.  O'Hara's Cyberstalking Was Not Limited to Romantic Interests

Finally, O'Hara and Co-Conspirator 1 did not isolate their cyberstalking to young women who rejected O'Hara's romantic advances.  They utilized the Internet to harass countless people, of which the government has identified three: an O'Hara work colleague (Victim 6), a high school classmate (Victim 5), and a stranger who once waited on them at a restaurant in high school (Victim 4).

The PSR sets forth some of the conduct perpetrated towards these victims.  PSR ¶¶ 127-138.  But once again, O'Hara's intent should not be divorced from his actions.  For instance, with respect to Victim 6, during the two months that O'Hara solicited Co-Conspirator 1 to call Victim 6 throughout the work day, he delighted in having a front-row seat to Victim 6's confusion and fear.  On February 23, 2018, he conveyed the following in one afternoon of torment:

> O'Hara: You were just breathing lmaoooo
>
> O'Hara: He played it on speaker and he's freaked out.
>
> …
>
> O'Hara: His face was priceless.
>
> …
>
> O'Hara: He just called his wife lmaooo
>
> O'Hara: He accused me but I played it off.
>
> …
>
> O'Hara: I know he's scared shitless. Leave an angry voicemail.  Say your name is Mitt.  He met with a guy named Mitt yesterday and he said he was mad weird.

Ex. A at 6357 - 6359.  A few days later, O'Hara reported:

> O'Hara: He's legit concerned lmao

9

...

O'Hara: You're doing great.  Drinks on me next time we go out.

*Id.* at 6417.  It took confrontation not only by Victim 6 but also by his boss to induce O'Hara to

stop harassing Victim 6 in late March 2018.  *Id.* at 6592.  The torment of others did not subside.

Victim 5 was perhaps the most frequent and longest-running target of O'Hara's

cyberstalking acts.  Over the years, O'Hara and Co-Conspirator 1 used Victim 5's name and

number in cyberstalking acts directed to "hundreds of people."  *Id.* at 6887.  Just a few examples

involving Victim 5's identity include food orders sent to Victim 1, his phone number left in the

alarming Thanksgiving message to Victims 2 and 3 ("Your daughter gave me chlamydia"), and

the harassing work calls to Victim 6.  In addition to using Victim 5's identity, O'Hara and Co-

Conspirator 1 also sent violent and disturbing messages to Victim 5's Linked-In account.  For

example, beginning on or about June 23, 2016, they sent the following messages to Victim 5:

- Hello Mr. [Victim Five]. My name is [Victim Four]. President and CEO of Tahiti Swimwear. Here at Tahiti Swimwear we are extremely excited to have some of your talents with us! We look forward to seeing you at the Corporate office in Bergenfield, NJ. Feel free to ask me questions either here or on my cell while we prepare for your orientation.

- Hello [Victim Five], It's [Victim Four]. President and CEO of Tahiti Swimwear. You may remember me. You know the guy that stuck his neck out and fought on your behalf. The guy you proceeded to reward for such generosity by f*cking him in the a*s and not showing up to work AGAIN. You have some nerve to f*ck me like this, you son of a b*tch.

- YOU WERE RESPONSIBLE FOR MAKING THAT HAPPEN YOU F*CKING GINGER C*NT

- I fear the consequences will be incredibly dire not only for [Victim Four] but for [Victim Five] as well. The leaders of Qatar are not as forgiving as [Victim Four] is. Violence is a way of life for them.

- [Victim Four] is dead. He died as he lived. Trying to dominate the swimwear industry by taking names and f*cking people in the ass.

10

PSR ¶ 128.  *See also* Ex. A at 4170 (reliving the posts in delight months later).  Victim 5

attempted to stop the harassment– once making contact with his suspected tormentors, frequently

emailing LinkedIn or GrubHub to get his information blocked, and responding to calls from

other victims – to no avail.  Rather, his persecutors delighted at what they perceived was his

outsized response to their torment.  *See, e.g.*, *id.* at 2801, 2816-2818.

In short, the eight identified victims are the floor of O'Hara's cyberstalking conduct,

showing the range of toxic acts he perpetrated in two years; the ceiling is much higher.[9]

## II.    THE GUIDELINES RANGE WAS CORRECTLY COMPUTED

In accordance with the Supreme Court's decision in *United States v. Booker*, 543 U.S.

220 (2005), district courts follow a three-step process in sentencing criminal defendants:

> A district court must begin the process by first calculating the applicable
> Guidelines range. After that initial calculation, the court must then rule on any
> motions for departure and, if a motion is granted, state how the departure affects
> the Guidelines calculation.  Finally, after allowing the parties an opportunity for
> argument, the court must consider all of the § 3553(a) factors and determine the
> appropriate sentence to impose, which may vary from the sentencing range called
> for by the Guidelines.

*United States v. Levinson*, 543 F.3d 190, 194-95 (3d Cir. 2009).

Here, the Guidelines range set forth in the Presentence Investigation Report has been

correctly calculated at 33 - 41 months' imprisonment (Offense Level 20/Criminal History

Category of I).  That offense level includes three units for each of the identified victims from the

Information: Victims 1, 2, and 3.  PSR ¶¶ 186 - 188.  The Defendant disputes the Probation

Office's Guidelines calculation on this basis.  See Def't Memo at pp. 16-18.

---

[9] *See, e.g.*, PSR ¶ 126 (noting O'Hara had cyberstalked other victims previously). Even the
excerpted text messages included as Exhibit A contain instances of harassing other unidentified
victims.  The full text history, over 7000 pages, includes many more still.

First, O'Hara pled guilty to a one-count conspiracy that charged multiple acts directed at multiple victims over the course of 18 months. *See* D.I. 30 (Information). Given the harm directed to and suffered by three individual victims, the Probation Office correctly applied U.S.S.G. § 1B1.2 in concluding that the conspiracy count should be treated as three separate units. This is logical – the government could have charged multiple individual cyberstalking counts for the various harms perpetrated against Victims 1, 2, and 3. Then there would be no question that the multiple counts should not be grouped under the language of the Guidelines. *See* U.S.S.G. § 2A6.1 cmt. n.2 ("Multiple counts involving different victims are not to be grouped under § 3D1.2.").

Second, the Probation Office then determined that the three units derived from the conspiracy offense should not be grouped. The Sentencing Guidelines provide explicit instructions on grouping multiple counts under U.S.S.G. § 3D1.2; there is no instruction for grouping offenses involving multiple victims. This is by design, as the application notes explain:

> A primary consideration in this section is whether the offenses involve different victims. For example, a defendant may stab three prison guards in a single escape attempt. Some would argue that all counts arising out of a single transaction or occurrence should be grouped together even when there are distinct victims. Although such a proposal was considered, it was rejected because it probably would require departure in many cases in order to capture adequately the criminal behavior. Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in distinct transactions, so that each such count should be treated separately rather than grouped together.

The Third Circuit has readily applied these instructions with respect to other offenses. *Cf. United States v. Ketcham*, 80 F.3d 789, 792-93 (3d Cir. 1996) (refusing to group child pornography distribution counts because there were separate children involved, and each count involved different victims); *see also United States v. Rudolph*, 137 F.3d 173, 181 (3d Cir. 1998) (likewise refusing to group counts after finding there were multiple identifiable victims).

12

The same analysis applies with respect to O'Hara's cyberstalking acts directed at Victims 1, 2, and 3.  Although O'Hara undoubtedly intended the bulk of his harm to affect Victim 1, he specifically directed individual acts to Victims 2 and 3 (and others).  O'Hara cannot deny that he contemplated this separate harm to Victim 1's parents.[10]  He also cannot deny that it caused harm to each individual victim.

O'Hara's better argument is that Victims 2 and 3 should be grouped as one parental unit because he meant harm to her parents but not necessarily to each individual parent.  However, this type of argument has been considered and rejected by multiple other courts evaluating harm inflicted on multiple victims through similar stalking offenses.  In *United States v. Simmons*, 649 F.3d 301 (5th Cir. 2011), the Fifth Circuit reviewed the 120-month sentence imposed on a defendant who stalked an ex-girlfriend and then made at least 13 bomb threats to her place of work.  The district court imposed nine counts for each separate victim who answered a call, and the Fifth Circuit upheld that determination, noting the defendant "may have initiated the calls to [employment] because of [victim's] employment there, but that does not obviate the fact that [defendant] threatened several different individuals when his attempts to reach her were blocked."  649 F.3d at 304.   And in *United States v. Nedd*, the First Circuit upheld the District Court's sentence of 33 months to a defendant who made multiple threatening phone calls after months of stalking his object of interest; the Court likewise upheld the district court's conclusion that each member of the victim's family constituted a separate count for purposes of the guidelines under U.S.S.G. § 3D1.2.  262 F.3d 85, 92-93 (1st Cir. 2001).  *See also United States v. Cope*, 24 F. App'x 414, 416-17 (6th Cir. 2001) (unpublished) (refusing to group stalking units

---

[10] *See, e.g.*, Ex. A at 4187 ("You think her parents want a birthday meal?"); PSR ¶ 121 ("HER MOM PICKED UP LMAOOOOOO").

given multiple email recipients even though the course of conduct was directed at one victim ex-girlfriend); *United States v. Miller*, 993 F.2d 16, 20-21 (2d Cir. 1993) (upholding district court's refusal to group letters mailed to victim because they each letter inflicted "separate psychological harm"; affirming upward departure to 24 months' incarceration); *United States v. Bonner*, 85 F.3d 522, 526 (11th Cir. 1996) (upholding 33-month sentence and refusal to group 20 counts of threatening communications because "the victim in this case suffered separate and distinct instances of fear and psychological harm").

These courts rightly recognize the same underlying principle motivating the Sentencing Guidelines' approach to multiple victims affected by the same base offense.   Even if harm toward only one person is intended, when the offender impacts multiple victims, he has to bear the individual consequences *just as they did*.

While firmly upholding the legal justifications for O'Hara's Guidelines range, the government seeks a slight variance of O'Hara's sentence to reflect a total offense level of 17, and a sentence of 24 to 30 months.  In this case, the harm directed at Victim 1 was the impetus for the government's investigation, prosecution, and conviction, and could have been charged as one substantive count of cyberstalking.  The government therefore submits that the normal Guidelines range for cyberstalking cases is appropriate for O'Hara.   No further variance is warranted.

### III.    THE COURT SHOULD IMPOSE A SENTENCE OF 30 MONTHS' INCARCERATION

The government seeks a sentence of 30 months for this defendant who inflicted years of harm and psychological torture on multiple victims, most prominently Victim 1.  Because this sentence reflects the harm O'Hara inflicted by cyberstalking others for years, and because none

of the other § 3553(a) factors demand recalibration, this Court should sentence O'Hara to 30 months' incarceration. *See* 18 U.S.C. § 3553(b)(1).

### a.   The Seriousness of Cyberstalking Offenses – 18 U.S.C. § 3553(a)(2)

Cyberstalking is a relatively new offense in the criminal code, developed as part of the interstate stalking statute passed in connection with the Violence Against Women Act.  *See* National Defense Authorization Act for Fiscal Year 1997, Pub. L. No.  104-201, 110 Stat. 2422, 2655 (1996).  Inherent in its name, cyberstalking is recognized as an outgrowth of traditional stalking offenses.  As with the broader stalking genre, it "is overwhelmingly a crime of violence against women carried out by men."  Nicola Cheyne & Marika Guggisberg, *Stalking: An Age Old Problem with New Expression in the Digital Age*, at 2, 8 (2018), *available at* https://www.academia.edu/36343027/STALKING_AN_AGE_OLD_PROBLEM_WITH_NEW_ EXPRESSIONS_IN_THE_DIGITAL_AGE.

Cyberstalking carries a higher starting offense level of 18.  U.S.S.G. § 2A6.2.  That offense level implicitly recognizes several harms.  First, the offender directs his conduct at a wholly innocent victim.  Second, the conduct inherently requires multiple acts (element of offense includes "course of conduct"), meaning the offender has opportunities to reconsider his criminality.  Finally, the long-term impact of cyberstalking conduct on the victim cannot be easily understood or quantified.[11]

---

[11] "Stalking … [has] potentially devastating effects on the targets of pursuit.  Pursuers often harass and intrude over years, with the average amount of time of such relationships being four months to a year and a half.  During this time, the pursuer can psychologically torture the object of affection through incessant calls at all hours, notes and unwanted gifts appearing in surprising places, showing up at work, school, places of recreation and socializing, and at home."  Brian H. Spitzberg & Gregory Hoobler, *Cyberstalking and the Technologies of Interpersonal Terrorism*, 4 NEW MEDIA & SOC. 71, 74 (2002) (internal citation omitted).

### b. The Nature and Circumstances of This Cyberstalking Offense - 18 U.S.C. § 3553(a)(1)

Missing in the nearly 200 pages submitted by O'Hara is meaningful consideration of the victims he harmed or what they suffered as a result of his actions. The Court cannot understand the nature and circumstances of the offense without that perspective.

For Victim 1, her tormentor knew every aspect of her life. He knew where she lived, where she worked, who she dated, and where she grew up. Eighteen months of throwing out phones, scrubbing her computers for viruses, installing deadbolts, and carrying mace was not enough – he found her once again in May 2018. By May 2018, as a 25 year old woman, she was afraid to leave her house alone. Reviewing O'Hara's text messages, there can be no doubt that was his very intention.

It was not enough for O'Hara to torment Victim 1, however. He also intentionally tormented loved ones, *on repeated occasions*, to enhance her suffering. The collateral consequences inflicted on others was of little import to O'Hara, but it was devastating to Victims 2 and 3. Victim 1's fear for herself was eclipsed only by her parents' fear for their only daughter, heightened by phone calls from their daughter's phone or messages left in the middle of the night. *See* Victim 2 Letter ("These messages truly freaked us out. I was always out of my mind with worry. These messages were terrifying for our family. It is hard to explain in words just how frightened we had become.").

These feelings of isolation, anguish, and terror are unfortunately all too common.

> The research to date evidences that the objects of obsessive pursuit suffer elevated levels of fear, anxiety, insomnia, post-traumatic stress syndrome, depression, distrust, paranoia, frustration, helplessness, and physical injury. In addition, many victims suffer significant economic and social costs, as they must change phone numbers, addresses, jobs, schools, hobbies, invest in protective technologies (e.g. home security) and services (e.g. bodyguards), and restrict their social activities and public life.

Brian H. Spitzberg & Gregory Hoobler, *Cyberstalking and the Technologies of Interpersonal Terrorism*, 4 NEW MEDIA & SOC. 71, 74-75 (2002) (internal citations omitted).  "Indeed, there is accumulating evidence to suggest that victims of stalking often experience post-traumatic stress symptoms as well as general psychological distress."  Emma Short et al., *The Impact of Cyberstalking*, 3 STUDIES IN MEDIA & COMMC'N  No. 2, at 25 (Dec. 2015); *id.* at 30 (confirming through study that cyberstalking victims experience the same patterns of psychological distress).

In this case, there were eight victims tormented by O'Hara and his co-conspirator.  Four of the victims wrote letters to this Court detailing the effects of O'Hara's cyberstalking on their lives.  All of the other identified victims detailed their fear, confusion, and alarm in interviews to investigators.  But there are many other victims beyond these eight who have likely been impacted by O'Hara.  Indeed, the very proliferation of his cyberstalking acts of terror against others for over two years distinguishes this case from others.

The other major factor that distinguishes this cyberstalking case from others is O'Hara himself.  Because given his background and upbringing, he knew right from wrong.  He chose his path every day for multiple years.  And those volitional acts should have consequences for this defendant the same way they do for others.[12]

### c.  Considering O'Hara as a Defendant – 18 U.S.C. § 3553(a)(1)

He's a nice young man from a good family.  That is the message of the letters submitted in support of O'Hara.  He had an "error in judgment."  He has been punished already because he will never again have a job in finance.  Def't Memo at 30.

---

[12] *See United States v. Tyree Miller*, 18-cr-89-CFC (D. Del. 2019) (sentencing 20 year-old to 18 years' incarceration for violent robbery spree committed in August 2018).

O'Hara asks this Court to weight his personal characteristics above all else in evaluating his sentence.  But in so doing, he discounts how pervasive the cyberstalking acts committed were to his character.  O'Hara has been perpetrating cyberstalking acts on victims for at least five years.  *See* PSR ¶ 126.  He has been intercepted and warned to stop on prior occasions.  Ex. B at RPT-00000009 (filed under seal).    This was not an "error in judgment."  It was a lifestyle.

There is no doubt that O'Hara is lucky to have the supportive network that he has, an asset that will benefit him in rehabilitating to society after a term of incarceration.  But he had that same supportive network when he decided, as an adult, to commence an 18-month cyberstalking campaign based on a young woman's polite refusals to date him.  He lived out of the same house when he sent multiple late-night food orders to her home and the homes of others.  He used the cell phone subscribed in his father's name to barrage other people's phones with unwanted calls from anonymous numbers.  He exploited his coveted job opportunities to harass colleagues during work.  And O'Hara consciously, soberly recognized what he was doing as he was doing it: "We're necessary evil."  Ex. A at 6961.

O'Hara is not a first-time offender.  He is a first-time defendant.

### d.  Considering Comparators Across Cyberstalking Cases, 18 U.S.C. § 3553(a)(6)

Cyberstalking is an incredibly fact-specific offense in which the acts of terror inflicted on a victim are too personal to allow meaningful comparison across cases.  Nevertheless, in consideration of the need for unwarranted sentencing disparities pursuant to § 3553(a), the government includes below a list of recent cases and sentences across the country:

- *United States v. Brandon Theresa*, 19-cr-118, D.I. 32 (E.D. Va. 2019) (sentenced to 12 months' and one day incarceration for persistent cyberstalking of ex-partner);

- *United States v. Daniel Lee Stone*, 17-cr-55, D.I. 112 (S.D. Iowa 2019) (sentencing man to 18 months' incarceration for cyberstalking a minor for three days);

- *United States v. William P. Elschlager*, 17-cr-108, D.I. 36 (S.D. Ohio 2018) (sentencing defendant to 24 months' incarceration for exploiting his skills and resources as a trooper to surveil ex-girlfriend with GPS device and harass her by referencing or arriving at her locations);

- *United States v. Kassandra Cruz*, 16-cr-20363, D.I. 40 (S.D. Fla. 2016) (sentencing 23-year-old female to 22 months' incarceration for creating fake Facebook account that she used to befriend victim and then barrage her with unwanted calls and extortive/threatening text messages);

- *United States v. Jesse L. Kessler*, 18-cr-8, D.I. 36 (E.D. Ky. 2018) (sentencing man to 24 months' incarceration for sending electronic messages to ex-girlfriend, intimate partner, and her family, including threatening email).

O'Hara asks this Court to look primarily at District of Delaware cases.[13]  He rightly distinguishes the sentences in *Matusiewicz*, *Generette*, and *Yung* as cases of extreme violence and terror for which the defendants received many years in prison (or in the *Matusiewicz* case, a lifetime).   But then he asks this Court to sentence him comparably to two non-cyberstalking defendants, Upadhyay and Castro.  Both cases are distinguishable.

In *United States v. Upadhyay*, No. 8-cr-118-JJF (D. Del. 2008), an emotionally troubled defendant perpetrated numerous acts of overt stalking against a former girlfriend and her parents for approximately one year.  There is no suggestion that the defendant overtly or covertly stalked anyone else.  In 2009, Upadhyay pled to a violation of 18 U.S.C. § 1030(a)(2)(C), which carried a Guidelines range of 0 to 6 months.  The sentence of probation imposed by the District Court

---

[13] O'Hara also prematurely cites Co-Conspirator 1 as a comparator because he claims, without knowledge or authority, that Co-Conspirator 1 will suffer no consequences for his actions. Because the government will not comment on pending investigations into possible other defendants, Co-Conspirator 1 is not a comparator that the Court should use in evaluating O'Hara's case.

did not even constitute a variance.   Further, this case is ten years old; our national understanding of the harms this type of conduct brings has evolved.

In *United States v. Castro*, No. 15-cr-47-LPS (D. Del. 2015), a woman with severe psychiatric issues sent harassing and threatening letters to coworkers at the University of Delaware until she was intercepted by federal agents in 2014.  Following her initial appearance on a criminal complaint, she was detained by the Court and the government quickly moved for a psychiatric exam.  D.I. 9.  Castro was then committed for further evaluation.  She remained committed for evaluations for six months, after having already served three months in state facilities.  After a period of rehabilitation and treatment motivated by her devotion to her son, she ultimately pled guilty to a violation of 18 U.S.C. § 876(c) and received a 15-month variance to time served on her offense.  The government joined that variance request.

O'Hara asks this Court to exceed the significant breaks given to emotionally troubled defendants like Upadhyay and Castro by varying *years* down to a sentence of probation.  This defendant and this crime do not warrant such significant departures from the Guidelines range to account for past similarly situated defendants.  Further, such a variance risks sending the wrong message to future similarly situated defendants.

### e.   The Principle of Deterrence in Cyberstalking Cases, 18 U.S.C. § 3553(a)(2)

As with any first-time defendant, the government hopes that the punishment of a federal felony and incarceration is sufficient to specifically deter O'Hara.  But as seen by the multiple fans who cheered O'Hara on and asked for advice on how to stalk others, there is a broader deterrent purpose that must be considered.

The crime of cyberstalking is still developing in public understanding given its nascence. It is a crime that is insufficiently reported, investigated, and prosecuted.  *See, e.g.*, Alexy et al.,

*Perceptions of Cyberstalking Among College Students*, 5 BRIEF TREATMENT & CRISIS INTERVENTION 279, 288 (2005) (noting from study data that "victims do not report incidents of stalking and cyberstalking to authorities.  Often, victims do not think the behavior is a criminal offense or that school authorities and law enforcement officers will take them seriously.").  This culture of silence has an impact on thousands of young women and men who suffer the consequences with no hope of recourse.  *Compare* Collin Binkley, *Student Group Says Harvard Failed To Address Racist Messages*, WASH. POST (July 27, 2019) (detailing lack of investigation or sanction for anonymous texts with racist themes sent to various Harvard Law students); *with* Hope & Sheridan, *Police and Public Perceptions of Stalking: The Role of Prior Victim-Offender Relationship*, 28 J. INTERPERSONAL VIOLENCE 320, at p. 11 (Aug. 2012) (noting police recognition of the importance of publicizing successful prosecutions in giving "victims the confidence to report it to police").

Victim 1 and her parents were the exception, persisting to combat and report his persistent cyberstalking over 18 months.  Only after he had progressed to the point of posting her name and number on a sex-chat website were the victims able to get sufficient law enforcement attention.[14]  But since May 2018, like all victims involved in the court process, they have endured ongoing trauma in having to revisit the most awful parts of their lives.  This sentencing hearing is more important to them than this memorandum can ever convey.  *See* Victim 3 Letter ("Judge Connolly, I am asking you to confirm through your sentence that [my daughter] has done the right thing in this case.").

---

[14] "[I]t is noteworthy that the stalking threat does not have to be physical to cause significant short- and long-term damage.  Indeed, … some stalking victims state a wish for their stalker to physically attack them, in order that they be taken seriously."  Dr. L. P. Sheridan & T. Grant, *Is Cyberstalking Different*, 13 PSYCH., CRIME & LAW 626, 636-37 (2007).

In the age of the ever-present Internet, it is far too easy to do what O'Hara did, and to get away with it for years. Other would-be defendants need to know that similar actions will have severe consequences. And other would-be victims need to know that the courage to pursue their tormentors will be met with just punishment.

### f.  30 Months' Incarceration Is Just Punishment -  18 U.S.C. § 3553(a)(2)(A)

As seen from analyzing the § 3553(a) factors in detail, there is nothing extraordinary that demands the Court depart significantly from the Guidelines range in this case in sentencing O'Hara. Instead, the Court must consider whether a sentence of multiple years is appropriate punishment for this offense. The government asks this Court to consider whether O'Hara should be sentenced to **less** punishment than that which he inflicted on eight victims for two years.

O'Hara's main arguments in support of his proposed variance of *years* from the Guidelines range of 33 – 41 months is that: (1) he has already been punished, (2) his actions were not as bad as others, and (3) he has learned from his mistakes of "immaturity and inexperience." Def't Memo at 10. None of these arguments merit the variance O'Hara seeks.

O'Hara asks this Court to afford him special treatment by varying *years* from the Guidelines range because as a young, first-time offender with a good upbringing, his month in prison and year of home confinement have been punishment enough. Def't Memo at 30 ("He will forever experience the deleterious collateral consequences of his conviction."). But courts repeatedly recognize that there cannot be an alternate system of justice for "first time offenders" from privileged backgrounds. *See, e.g.*, *United States v. Bistline*, 665 F.3d 758, 765-66 (6th Cir. 2012) ("The district court's recitation of these collateral consequences therefore does nothing to show that Bistline's sentence reflects the seriousness of his offense. Were it otherwise, these sorts of consequences – particularly ones related to a defendant's humiliation before his

community, neighbors, and friends—would tend to support shorter sentences in cases with defendants from privileged backgrounds."); *State of New Jersey in Interest of G.M.C.*, A-022-18T4, at 9, 13-14 (Sup. Ct. N.J. App. Div. June 14, 2019) (reversing and remanding family court judge refusing prosecution waiver request to try sixteen year-old rapist as an adult, and deriding the lower court's rationale that he was a "young man … from a good family").

Second, O'Hara leans heavily on older Delaware cases and his presently unindicted co-conspirator to contrast his conduct as comparatively innocuous.  But in so doing, he undercuts his own arguments that he has fully accepted responsibility for the havoc his conduct wreaked on others.

Finally, O'Hara asks the Court to discount his cyberstalking actions as the immature reactions of a young man who has personally atoned and corrected behavior over the last year. But for the women and men he terrorized, his actions were not the immature pranks of an angry young man – they were the obsessive, unrelenting, and tormenting actions that caused them to change their own lives to escape.  O'Hara should not now be able to escape the consequences.

The government respectfully asks this Court to sentence O'Hara to multiple years of incarceration for the multiple years of harm he inflicted on others.

## IV.    CONCLUSION

The government recommends a sentence of 30 months' incarceration.

Respectfully submitted,

DAVID C. WEISS
United States Attorney


By:  /s/ Whitney C. Cloud
Whitney C. Cloud
Assistant United States Attorney

Dated: August 13, 2019